AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | Case No. |
| Tai SU, | 2:24-MJ-02499-DUTY |
| Defendant. | |

**FILED**
CLERK, U.S. DISTRICT COURT

April 28, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ch _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about April 26, 2024, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Neil Kleifges, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   April 28, 2024

*Judge's signature*

City and state:   Los Angeles, California          Hon. Brianna Fuller Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kedar Bhatia (x4442)

## **AFFIDAVIT**

I, Neil Kleifges, being duly sworn, declare and state as follows:

### **I.   PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint against TAI SU ("SU") for a violation of Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud).

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the United States Department of Homeland Security, Homeland Security Investigations ("HSI") in Long Beach, California, as described in Attachment A-1:

a.    A black Apple iPhone 12 mini with IMEI number 353007111022446 with a clear case ("SUBJECT DEVICE-1"); and

b.    A black Apple iPhone 12 mini with a clear case with IMEI number 353008116925344 ("SUBJECT DEVICE-2" and, collectively with SUBJECT DEVICE-1, the "SUBJECT DEVICES").

3.    This affidavit is also made in support of an application for a warrant to search a white Toyota Prius Hybrid XLE, bearing California License Plate #9BLS036 (the "SUBJECT VEHICLE"), as described more fully in Attachment A-2.

4.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of

Title 18, United States Code, Sections 912 (impersonating an officer or employee of the United States), 1028 (fraud and related activity in connection with identification documents, authentication features, and information), 1028A (aggravated identity theft), 1029 (access device fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire fraud and bank fraud), 1956 (money laundering), 1957 (transacting and attempting to transact in criminal proceeds over $10,000), 1960 (operating an unlicensed money remitting business), and Title 31, United States Code, Section 5332 (bulk cash smuggling) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

5.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>BACKGROUND OF AFFIANT</u>

6.   I am a Special Agent with HSI and have been so employed since August 2021.  I am currently assigned to the El Camino Real Financial Crimes Task Force ("ECR"), where I investigate matters concerning bank fraud, wire fraud, identity theft, money laundering, and other illegal financial transactions.

7.   Before being assigned to ECR, I was assigned to the Office of the Assistant Special Agent in Charge, Los Angeles International Airport, where I was responsible for investigating drug trafficking and smuggling organizations using the U.S. mail system to transport and sell narcotics throughout Los Angeles.

8.   Prior to becoming a Special Agent with HSI, I was employed for five years as a consultant for Deloitte Consulting LLP, working in their federal government sector supporting Homeland Security clients.  In this role, I assisted over 100 federal investigations by providing intelligence research and analysis into foreign and domestic people and businesses involved in drug smuggling, drug trafficking, illicit trade, human trafficking, and terrorism.

9.   I have completed approximately six months of training at the Federal Law Enforcement Training Centers, where I completed the Criminal Investigator Training Program and HSI Special Agent Training Program.  During my training, I was

trained in conducting criminal investigations and received hundreds of hours of comprehensive, formalized instruction into financial crime, money laundering, drug trafficking, drug smuggling, human trafficking, street gangs, trade fraud, and asset identification, seizure, and forfeiture.

### III. SUMMARY OF PROBABLE CAUSE

6.   On or about April 25, 2024, HSI became aware of a financial fraud scheme that defrauded two elderly victims of $25,000 on April 23, 2024. The fraudulent scheme was initiated via a phishing email that the victims opened on their desktop computer. The cyber criminals were able to take control of the victims' desktop and instructed the victims to call a phone number for Microsoft Support. The victims called the number and were connected with a "specialist," who advised the victims that their computer was hacked and that their bank accounts were compromised. The victims were transferred to an individual purporting to be a "Fraud and Risk Investigator" with City National Bank, who instructed the victims that they needed to withdraw $25,000 in cash and give the money to the purported federal agents when they come to the victims' house. Later in the day, two unknown men appeared at the victims' house, one of them displayed a badge purporting to be a federal agent, and the two men took the $25,000 cash.

7.    On or about April 26, 2024, after the cyber criminals attempted to continue their scam and obtain more cash from the victims, HSI and Task Force Officers conducted a sting operation at the victims' residence in order to lure the scammers and federal agent impersonators back to the address to collect $35,000 from the victims.

8.    Victim M.S., who is 86-years-old, was able to successfully lure Co-Conspirator-2 to send a "Federal Officer" from the Federal Reserve System to collect the $35,000 in $100 bills.

9.    At approximately 3:15 PM, a man who claimed to be "Gavin," later determined to be SU, who claimed to be working for Coinbase, arrived at the victims' residence in the SUBJECT VEHICLE to collect the $35,000. HSI Agents and Task Force Officers arrested SU and recovered both SUBJECT DEVICES on SU's person, as well as bulk cash currency in large denominations.

## IV.    STATEMENT OF PROBABLE CAUSE

### A.    Two Senior Citizens Are Victims of a Phishing Scam and are Defrauded $25,000

10.   Based on my review of law enforcement reports and conversations with HSI agents, on or about April 25, 2024, a City National Bank ("CNB") employee alerted HSI of two senior citizens, Victims B.S. and M.S. (the "Victims"), who held an account at CNB, that withdrew $25,000 in U.S. currency on April

23, 2024, from CNB's Encino branch. The Victims withdrew the
cash to give to unknown individuals posing to be federal agents
from the Federal Reserve System.

11.   HSI Agents reviewed an Internet Crime Complaint Center
("IC3") report made on behalf of the Victims and interviewed the
Victims on or about April 26, 2024. The following is a timeline
of the events surrounding the Victims.

    1.   The Victims Receive a Phishing Email

12.   Based on my conversations with the Victims, I have
learned the following:

a.   On or about April 23, 2024, the Victims were
checking their emails on their desktop computer at their
residence when they opened an email received on April 21, 2024,
from a particular email address ("Scammer Email-1") that
contained a link. The Victims opened the link in the email,
which proceeded to lock and freeze their desktop computer. A
black screen appeared, and a phone number ending in 5813
("Target Number-1") appeared on the screen and stated that it
was a number associated with "Microsoft Support." The message on
the screen instructed the Victims to call Target Number-1. The
Victims called Target Number-1 and a female with a foreign
accent ("Co-Conspirator-1") answered the phone. Co-Conspirator-1
told the Victims she was a Microsoft Specialist and that their
computer was "hacked," and the "hackers" had the Victims' CNB

bank account information. Co-Conspirator-1 asked for the last
four digits of Victim M.S.'s Social Security Number, which
Victim M.S. provided. Co-Conspirator-1 then transferred the
Victims to a purported "Fraud and Risk Management" specialist
from CNB, who was referred to as "Max Wilson" and had a male
voice ("Co-Conspirator-2").

    b.   Co-Conspirator-2 then told the Victims that an
unauthorized deposit of $25,000 had been credited into the
Victims' joint CNB bank account (the "CNB Account"). Co-
Conspirator-2 instructed the Victims to withdraw $25,000 from
the CNB Account in small denominations and to package the money
in paper with masking tape. Co-Conspirator-2 advised the Victims
that "federal agents" would arrive at their residence and pick
up the money later in the afternoon.

    2.   Two Unknown Individuals Posing as Federal Agents
         Pick Up $25,000 from the Victims.

13. Based on my conversations with the Victims and as
corroborated in part by documents provided by the Victims as
discussed below, I have also learned the following:

    a.   On or about April 23, 2024, the Victims – still
unaware that they were being defrauded – arrived at the CNB
Encino Branch while on the phone with Co-Conspirator-2. Co-
Conspirator-2 advised the Victims that they had to remain on the
phone line with Co-Conspirator-2, and would need to advise him
when they left their house, arrived at the bank, left the bank

with the cash, and, finally, when they arrived back to their
residence with the cash.

       b.   While at the branch, the Victims spoke with a
bank teller and asked if they had enough funds in the CNB
Account to support a cash withdrawal of $25,000. The teller told
the Victims that they had sufficient available funds and the
couple withdrew the requested amount.

       c.   Once the Victims returned to their residence, one
white male ("Co-Conspirator-3") arrived at the Victims'
residence. Victim M.S. answered the door and Co-Conspirator-3
showed a badge and said he was there to pick up the money.
Another white male ("Co-Conspirator-4") was standing near the
street. Victim M.S. gave $25,000 to Co-Conspirator-3 and both
men departed the area. Shortly after, Victim M.S. checked his
email, which contained an email received on April 24, 2024, from
another particular email address ("Scammer Email-2"). The title
of the email was "Confidencial [sic] Documents" and contained a
PDF notice from the Federal Reserve System ("FRS"), shown below:

14.   Based on my knowledge, training, and experience working financial crimes, I know that phishing scams will often include doctored documents from government agencies, such as the purported letter from the Federal Reserve System here, to persuade victims that the request for funds is legitimate and of upmost importance. Due to the fact that many phishing attempts are directed by individuals located outside of the United States

where English is not the native language, such emails and documents utilized to further this scheme often contain grammatical errors and poor syntax.

        3.   <u>Two Scammers Ask the Victims for More Money</u>

    15.  Based on my conversations with the Victims, I have learned that on or about April 24 and April 25, 2024, the Victims received multiple phone calls from both Target Number-1 and from a phone number ending in 2737 ("Target Number-2", and together with Target Number-1, the "Target Numbers"). On or about April 24, 2024, Victim M.S. received a call from Co-Conspirator-2 and was instructed to withdraw another $10,000 in $100 bills from a particular CNB branch in Westwood, California. On or about April 24, 2024, the Victims traveled to the Westwood branch but were unable to withdraw the money. However, the Victims then traveled to the Beverly Hills branch of CNB and successfully withdrew $10,000 in cash. The Victims did not receive any more calls that day and did not give the $10,000 to any individuals.

    16.  Based on my conversations with the Victims, I have learned that on or about April 25, 2024, Victim B.S. received a call from Co-Conspirator-2, who was using Target Number-2, and was instructed to withdraw $25,000. Victim B.S.'s daughter answered the phone and said she would call back. No further calls were made to any Target Numbers and the Victims did not

answer any phone calls from the Target Numbers for the rest of the day.

**B.   April 26, 2024: HSI Sting Operation**

17.   On or about April 25, 2024, HSI learned about the ongoing fraud scheme. On or about April 26, 2024, HSI conducted a sting operation at the Victims' residence. The phone calls discussed below were recorded and were heard by HSI agents as they were occurring.

18.   Based on my observations, I know that on April 26, 2024, Victim M.S. called Target Number-1 and spoke with Co-Conspirator-2, who identified himself as "Max Wilson," i.e., the same name Co-Conspirator-2 used previously. Co-Conspirator-2 asked Victim M.S. to confirm that he had $35,000, which corroborates the Victims' statements that they were told to withdraw $10,000 and then $25,000 after they had already paid the scammers $25,000. Victim M.S. confirmed that he had $35,000. Co-Conspirator-2 told Victim M.S. that Victim M.S. would receive a phone call from a secure line from Target Number-2. While this contact was ongoing, Victim M.S. received a phone call from Co-Conspirator-1 who identified herself as "Michelle," and who Victim M.S. recognized as the voice of Co-Conspirator-1.

19.   Co-Conspirator-2 then called Victim M.S. again from Target Number-2. HSI had been working with Victim M.S. to attempt to arrange for another in-person pickup of funds, as had

occurred previously. Throughout much of the phone call, Co-Conspirator-2 tried to have Victim M.S. deposit some of the funds into a virtual wallet by traveling to a physical location. Eventually, however, Co-Conspirator-2 agreed to have the money picked up from the Victims' residence and told Victim M.S. that "federal officers" would come to pick up the money from Victim M.S. at the Victims' residence. Co-Conspirator-2 said the purported federal officers were an hour-and-a-half away from the Victims' residence, and had flown in from Washington, D.C., to pick up the money.

20.   Co-Conspirator-2 advised Victim M.S. to write his/her name, the last four digits of Victim M.S.'s Social Security Number, the last four digits of Victim M.S.'s bank account number, the amount of cash, and the denominations of the bills. Co-Conspirator-2 instructed Victim M.S. to include this information with the package containing the currency. Co-Conspirator-2 also asked Victim M.S. what he was wearing and advised that the "federal officer" was named "Gavin" and that he would be wearing gray clothing. Co-Conspirator-2 advised that the "federal officer" picking up the funds from Victim M.S. would respond when asked for a "secure passcode," and that the "passcode" was the word "Absolute." Co-Conspirator-2 confirmed that "Gavin" was a "Federal Reserve" officer and would be arriving in five minutes.

21.  At approximately 3:15 PM, which was approximately when Co-Conspirator-2 said the purported officer would be arriving, while on a phone call using Target Number-2, Co-Conspirator-2 told Victim M.S. to go outside and to take his phone with him. When Victim M.S. opened the front door of his house, there was no one outside. Victim M.S. told Co-Conspirator-2 that no one was outside, and Co-Conspirator-2 responded that Victim M.S. should wait.

22.  At approximately 3:18 PM, an individual, later identified as SU, drove up to the Victims' residence and parked his vehicle (the SUBJECT VEHICLE). When SU was approaching the house, Co-Conspirator-2 reminded Victim M.S. that the "person's" name was "Gavin" and that he was wearing gray clothes.

23.  When SU approached the front of the home, Victim M.S. asked if he had identification. SU responded by stating, "Gavin." When Victim M.S. asked again for identification, SU responded by stating, "Absolute." Victim M.S. asked for whom SU worked, and SU responded, "Coinbase." Victim M.S. asked Co-Conspirator-2, who was on speakerphone and in the presence of SU, if Co-Conspirator-2 was still present on the phone, and Co-Conspirator-2 responded that he was and asked Victim M.S. to hand over "the box," i.e., the container with the $35,000.

13

24.   At that point, Victim M.S. retreated into the home, saying he would get the box, and HSI agents emerged to arrest SU.

25.   The photographs below are from a video recording of SU approaching Victim M.S. at the Victims' residence to pick up $35,000 as part of the fraud scheme, moments before agents arrested him:





26.   Based on my knowledge and experience in cryptocurrency, I know that Coinbase is a legitimate publicly-traded company based in California that operates a cryptocurrency exchange platform and that cash pick-ups at individual residences is not a service provided by Coinbase.

27.   After HSI Agents arrested SU, they recovered SUBJECT DEVICE-1 and SUBJECT DEVICE-2 from SU's person. HSI Agents also found on SU's person thousands of dollars in bulk U.S. Currency in large bill denominations:



28.   Based on my knowledge and experience investigating financial crimes, I know that fraudsters involved in Phishing Scams and Telemarketing Schemes will often conceal their true identities by providing false personal identifying information such as fake names, such as the one SU used here, Gavin, to their victims. Additionally, I know that individuals entrusted with cash pickup from victims of fraud will do multiple runs in one day and will carry proceeds collected from the victims they defrauded on their person until these funds are deposited into a funnel account or crypto wallet controlled by a co-conspirator.

29.   Furthermore, based on my training and experience, I believe that SU likely communicated with Co-Conspirator-2 (or

others working with Co-Conspirator-2) in the time between when Victim M.S. declined to travel to deposit the $35,000 that the conspirators were seeking and when SU ultimately arrived to pick up the money. This communication was necessary due to the conspirators needing to change their original plan and relay that to SU. Co-Conspirator-2 also relayed the purported agent's name and the "passcode" between Victim M.S. and SU; Co-Conspirator-2 relayed what SU was wearing; and Co-Conspirator-2 was able to transmit updates on SU's timing. I believe these nearly real-time updates – prompted in part by a same-day change in the criminal scheme – mean that SU was communicating with Co-Conspirator-2. Based on my training and experience, I believe SU was very likely communicating with Co-Conspirator-2 using one or both of the SUBJECT DEVICES, which are often the most readily available means of communicating real-time updates.

30.  Based on my participation in this investigation and my personal observations, I know that on or about April 26, 2024, the Victims called the Target Numbers several times when HSI agents were present. When the Victims called but the conspirators did not pick up, the phone played a voicemail message indicating that the Target Numbers were Google Voice numbers.

31.  Based on my training and experience, and my review of publicly available information and conversations with other HSI

agents, I have learned that Google Voice is a service through which a Google account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline.[1] Based on my review of publicly available information,[2] I have learned that Google does not have any data centers in the State of California. Accordingly, based on my training and experience, when the conspirators had telephone calls with the Victims – including when Co-Conspirator-2 was on a speakerphone with Victim M.S. while in the presence of SU – I believe those communications transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce a writing, sign, signal, picture, or sound for the purpose of executing the criminal scheme or artifice described above.

## V.   TRAINING AND EXPERIENCE REGARDING WIRE AND BANK FRAUD, IDENTITY THEFT, AND ACCESS DEVICE FRAUD

32.   Based on my training and experience and information obtained from other law enforcement officers who investigate wire and bank fraud and identity theft crimes, I know the following:

---

[1] See Set up Google Voice, Google, https://support.google.com/voice/answer/115061 (last visited Apr. 28, 2024).

[2] See Discover Our Data Center Locations, Google, https://www.google.com/about/datacenters/locations/ (last visited Apr. 28, 2024).

a.   People involved in wire and bank fraud, identity theft, and access device fraud crimes often collect checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents belonging to other people that they can use to fraudulently obtain money and items of value.  It is a common practice for those involved in such crimes to use either false identification or stolen real identification to make purchases with stolen access devices at in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such fraudulent transactions.

b.   It is common for identity thieves, and individuals engaged in wire and bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.  Such equipment and software are often found in the thieves' possession as they can be small and easily portable.

c.   It is common practice for individuals involved in identity theft, wire and bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects

often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; (6) verifying the status of stolen access devices; and (7) coordinating with co-conspirators.

33.  Based on my training and experience, I know that individuals who participate in identity theft, wire and bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI.   **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

34.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

35.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

d.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

e.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places

where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   f. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   g. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  36.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

37.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.   <u>CONCLUSION</u>

38.  For all the reasons described above, there is probable cause to believe that SU committed a violation of Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud). Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses,

will be found in the SUBJECT DEVICES and the SUBJECT VEHICLE, as
described in Attachments A-1 and A-2.


Attested to by the applicant in

accordance with the requirements

of Fed. R. Crim. P. 4.1 by

telephone on this  28   day of

April, 2024.


_____
HON. BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

The following digital devices, collectively, (the "SUBJECT DEVICES"), which were seized by Homeland Security Investigations ("HSI") on or about April 26, 2024, from the person of Tai SU ("SU"), and are currently maintained in the custody of the Homeland Security Investigations ("HSI") in Long Beach, California:

      a.   A black Apple iPhone 12 mini with IMEI number 353007111022446 with a clear case ("SUBJECT DEVICE-1"); and

      b.   A black Apple iPhone 12 mini with a clear case with IMEI number 353008116925344 ("SUBJECT DEVICE-2").

**ATTACHMENT A-2**

VEHICLE TO BE SEARCHED

The vehicle to be searched is a white Toyota Prius Hybrid XLE, bearing California License Plate #9BLS036 ("SUBJECT VEHICLE"), as described more fully in Attachment A-2.



ATTACHMENT B

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 912 (impersonating an officer or employee of the United States), 1028 (fraud and related activity in connection with identification documents, authentication features, and information), 1028A (aggravated identity theft), 1029 (access device fraud), 1343 (wire fraud),  1344 (bank fraud), 1349 (conspiracy to commit wire fraud and bank fraud), 1956 (money laundering), 1957 (transacting and attempting to transact in criminal proceeds over $10,000), 1960 (operating an unlicensed money remitting business), and Title 31, United States Code, Section 5332 (bulk cash smuggling) (the "Subject Offenses"), namely:

a.   Records and information that may establish ownership and control (or the degree thereof) of the SUBJECT DEVICES, including address books, contact or buddy lists, bills, invoices, receipts, registration records, bills, correspondence, notes, records, memoranda, telephone/address books, photographs, video recordings, audio recordings, lists of names, records of payment for access to newsgroups or other online subscription services, and attachments to emails, including documents, pictures and files;

b.   Records and information concerning any participants or co-conspirators involved in the Subject Offenses described in the affidavit used to obtain this warrant,

1

including information relating to their identities, whereabouts, communications, and methods of contact and communication, pictures or videos exchanged with perpetrator(s) of the scheme;

      c.   Contents of any calendar or date book stored on any of the digital devices;

      d.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

      e.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

      f.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than Tai SU, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

      g.   Records, documents, programs, applications, or materials pertaining any bank accounts, credit card accounts, or other financial accounts, including applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

h.    Records, documents, programs, applications, or materials pertaining to all or part of a scheme to infect computers with viruses; individuals purporting to be able to "resolve" the problem; and individuals then obtaining money from the person whose computer was infected;

i.    Records, documents, programs, applications, or materials pertaining to impersonation of any law enforcement officers, other state or federal officers, or employees of a corporation or business;

j.    Records, documents, programs, applications, or materials pertaining to the receipt or transmission of bulk currency, including instructions to collect money, evidence of receiving or possessing bulk currency, and evidence of transmitting bulk currency;

k.    Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

l.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices, and which relate to the Subject Offenses;

m.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from any digital device, and which relate to the Subject Offenses;

n.   Any altered, counterfeit, or fraudulent identifications, checks, access devices, monetary instruments, or other official documents, or the use thereof;

o.   Any and all cryptocurrency, to include the following:

i.   any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

ii.   any and all representations of cryptocurrency private keys, whether in electronic or physical format;

iii. any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

2.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof, including but not limited to the SUBJECT DEVICES.

3.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.   records of or information about Internet Protocol addresses used by the device.

4.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICE

6.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

7

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

8

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

    8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.